No. 21-16494

## IN THE UNITED STATES COURT OF APPEALS

### FOR THE NINTH CIRCUIT

TOP AGENT NETWORK, INC.,

*Plaintiff-Appellant,*

v.

NATIONAL ASSOCIATION OF REALTORS and SAN FRANCISCO ASSOCIATION OF REALTORS,

*Defendants-Appellees,*

CALIFORNIA ASSOCIATION OF REALTORS, INC.,

*Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

(JUDGE VINCE CHHABRIA)

BRIEF FOR THE UNITED STATES OF AMERICA AS AMICUS CURIAE IN SUPPORT OF NEITHER PARTY

JONATHAN S. KANTER
  *Assistant Attorney General*
DOHA G. MEKKI
  *Principal Deputy Assistant Attorney General*
MAGGIE GOODLANDER
  *Deputy Assistant Attorney General*
DAVID B. LAWRENCE
  *Policy Director*
DANIEL E. HAAR
NICKOLAI G. LEVIN
STEVEN J. MINTZ
  *Attorneys*
  U.S. Department of Justice
  Antitrust Division
  950 Pennsylvania Ave., NW
  Washington, DC 20530-0001
  Tel. 202-353-0256

# Table of Contents

STATEMENT OF INTEREST ...................................................................1

STATEMENT OF ISSUES PRESENTED ...............................................2

STATEMENT ...........................................................................................3

SUMMARY OF ARGUMENT ..................................................................9

ARGUMENT .........................................................................................12

  A.  The District Court's Antitrust-Injury Analysis Erred in Focusing on the Wrong Product Market. ................................................13

  B.  The District Court Wrongly Equated More MLS Listings to "Procompetitive" and More Listings Off the Dominant MLS to "Anticompetitive." ...................................................................23

  C.  A Plaintiff's Own Anticompetitive Conduct Does Not Bar Its Lawsuit Against Another Antitrust Law Violator. .....................32

CONCLUSION .......................................................................................36

CERTIFICATE OF COMPLIANCE........................................................38

CERTIFICATE OF SERVICE................................................................39

# Table of Authorities

**Cases**                                                     **Page(s)**

*American Ad Management, Inc. v. GTE Corp.*,
92 F.3d 781 (9th Cir. 1996)...................................................................31

*Apple, Inc. v. Pepper*,
139 S. Ct. 1514 (2019)..........................................................................16

*Associated Gen. Contractors v. California State Council of Carpenters*,
459 U.S. 519 (1983)..............................................................................12

*Atlantic Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990)..............................................................................12

*Boardman v. Pacific Seafood Group*,
822 F.3d 1011 (9th Cir. 2016)..............................................................15

*Brantley v. NBC Universal, Inc.*,
675 F.3d 1192 (9th Cir. 2012)..............................................................25

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977)..............................................................................13

*Calnetics Corp. v. Volkswagen of America, Inc.*,
532 F.2d 674 (9th Cir. 1976)..........................................................34, 35

*Case-Swayne Co. v. Sunkist Growers, Inc.*,
369 F.2d 449 (9th Cir. 1966)................................................................15

*Case-Swayne Co. v. Sunkist Growers, Inc.*,
389 U.S. 384 (1967)..............................................................................16

*Clamp-All Corp. v. Cast Iron Soil Pipe Institution*,
851 F.2d 478 (1st Cir. 1988).................................................................25

*Copperweld Corp. v. Independence Tube Corp.*,
467 U.S. 752 (1984).........................................................................32, 33

*Daniel v. American Board of Emergency Medicine*,
428 F.3d 408 (2d Cir. 2005)............................................................29, 30

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
   504 U.S. 451 (1992)................................................................... 19

*Fashion Originators' Guild v. FTC*,
   312 U.S. 457 (1941)................................................................... 34

*First Beverages, Inc. v. Royal Crown Cola Co.*,
   612 F.2d 1164 (9th Cir. 1980).................................................... 34

*Fishman v. Estate of Wirtz*,
   807 F.2d 520 (7th Cir. 1986)...................................................... 25

*FTC v. Indiana Federation of Dentists*,
   476 U.S. 447 (1986)................................................................... 19

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977)..................................................................... 2

*Javelin Corp. v. Uniroyal, Inc.*,
   546 F.2d 276 (9th Cir. 1976)...................................................... 34

*Kiefer-Stewart Co. v. Joseph E. Seagram & Sons,
Inc.*, 340 U.S. 211 (1951) .................................................... 32, 33

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
   232 F.3d 979 (9th Cir. 2000)...................................................... 22

*Lamp Liquors, Inc. v. Adolph Coors Co.*,
   563 F.2d 425 (10th Cir. 1977).................................................... 35

*Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*,
   334 U.S. 219 (1948)...................................................... 13, 14, 15

*Memorex Corp. v. IBM Corp.*,
   555 F.2d 1379 (9th Cir. 1977)................................................ 34, 35

*National Society of Professional Engineers v. United States*,
   435 U.S. 679 (1978).................................................... 19, 24, 26

*NCAA v. Alston*,
   141 S. Ct. 2141 (2021)............................................................... 26

iii

*Northern Pacific Railway Co. v. United States*,
356 U.S. 1 (1958) ............................................................... 12

*Oahu Gas Service, Inc. v. Pacific Resources, Inc.*,
838 F.2d 360 (9th Cir. 1988) ............................................... 23

*Oltz v. Saint Peter's Community Hospital*,
861 F.2d 1440 (9th Cir. 1988) ............................................. 31

*Perma Life Mufflers v. Int'l Parts Corp.*,
392 U.S. 134 (1968) ..................................................... 33, 34

*Pool Water Products v. Olin Corp.*,
258 F.3d 1024 (9th Cir. 2001) ............................................. 22

*Re/Max International, Inc. v. Realty One, Inc.*,
173 F.3d 995 (6th Cir. 1999) ........................................... 18, 29

*Realcomp II, Ltd. v. FTC*,
635 F.3d 815 (6th Cir. 2011) ............................................... 26

*Rebel Oil Co. v. ARCO*,
51 F.3d 1421 (9th Cir. 1995) ............................................... 13

*Robertson v. Sea Pines Real Estate Cos.*,
679 F.3d 278 (4th Cir. 2012) ............................................... 31

*Simpson v. Union Oil Co. of California*,
377 U.S. 13 (1964) ........................................................... 33

*Standard Oil Co. v. FTC*,
340 U.S. 231 (1951) ..................................................... 24, 25

*Sullivan v. NFL*,
34 F.3d 1091 (1st Cir. 1994) ............................................... 22

*Tampa Electric Co. v. Nashville Coal Co.*,
365 U.S. 320 (1961) ......................................................... 18

*Thompson v. Metropolitan Multi-List, Inc.*
934 F.2d 1566 (11th Cir. 1991) ........................................... 14

iv

*The PLS.Com, LLC v. NAR, et al.*,
   32 F.4th 824 (9th Cir. 2022) .............................................. 14, 16, 17, 27

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
   676 F.2d 1291 (9th Cir. 1982) ............................................... 23

*United States v. Loew's*,
   371 U.S. 38 (1962) .................................................. 25

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ............................................. 27

*United States v. Syufy Enterprises*,
   903 F.2d 659 (9th Cir. 1990) ............................................. 25

*Viamedia, Inc. v. Comcast Corp.*,
   951 F.3d 429 (7th Cir. 2020) ............................................. 31

*Volvo North America Corp. v. Men's Int'l Professional Tennis Council*,
   857 F.2d 55 (2d Cir. 1988) ........................................... 17, 28

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
   549 U.S. 312 (2007) ................................................. 21, 22

*Yellow Page Cost Consultants, Inc. v. GTE Directories Corp.*,
   951 F.2d 1158 (9th Cir. 1991) ............................................. 17

**Statutes**

15 U.S.C. § 1 ........................................................... 8

15 U.S.C. § 15 .......................................................... 12

**Rules**

Federal Rule of Appellate Procedure 29(a) ............................... 1

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp,
   *Antitrust Law* (5th ed. 2021) ........................................... 32

## STATEMENT OF INTEREST

The United States enforces the federal antitrust laws and has a significant interest in preventing anticompetitive conduct in the real-estate industry. Over the last two decades, the United States has investigated and challenged various rules and practices of the National Association of Realtors ("NAR") and regional multiple listing services ("MLSs"). *See, e.g.*, *United States v. NAR*, No. 1:05-cv-5140 (N.D. Ill. 2005); *United States v. Consolidated Multiple Listing Service, Inc.*, No. 3:08-cv-01786-SB (D.S.C. 2008). Among other things, the United States recently filed an amicus brief in a case before this Court challenging the same NAR Clear Cooperation Policy at issue here: *The PLS.Com, LLC v. NAR, et al.*, 32 F.4th 824 (9th Cir. 2022).[1]

We file this amicus brief under Federal Rule of Appellate Procedure 29(a) to address legal errors in the District Court's antitrust-injury analysis. While proof of antitrust injury is not required in federal enforcement actions, it is required in private antitrust litigation, which

---

[1] The United States also is in litigation with NAR over the enforcement of a Civil Investigative Demand related to the Clear Cooperation Policy, among other practices and rules. *National Association of Realtors v. United States*, No. 21-2406, 2023 WL 387572 (D.D.C. Jan. 25, 2023).

1

complements government actions by deterring antitrust violations. Correcting the legal errors below furthers "the longstanding [Congressional] policy of encouraging vigorous private enforcement of the antitrust laws." *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 745 (1977).

We take no position on the merits of Top Agent Network's ("TAN") claims or on the veracity of its factual allegations (which are accepted on a motion to dismiss).

## STATEMENT OF ISSUES PRESENTED

This brief addresses three legal issues:

1. Whether the District Court erred in focusing on the wrong product market in assessing whether TAN sustained antitrust injury from the Defendants' allegedly anticompetitive conduct.

2. Whether the District Court erroneously deemed any practice that adds property listings to an MLS as "procompetitive," while deeming any rival service that has limited membership and takes listings away from an MLS as "anticompetitive."

3. Whether the District Court further erred by suggesting that, because it had concluded that TAN has an inherently "anticompetitive" business model, TAN necessarily lacked antitrust injury.

2

**STATEMENT**

1.  Residential real estate in the United States is marketed primarily through NAR-affiliated MLSs, which are subscription-based online listings of available properties. "Typically, the dominant [NAR-affiliated] MLS or MLSs in a given market will host listings for around 90% of homes sold in that market." Third Amended Complaint ("Complaint") ¶3 (2-ER-69). NAR promulgates rules that its affiliates must incorporate into the bylaws governing their MLSs. *Id.* ¶10 (2-ER-71). "Because such a high percentage of a local market's home sales are arranged through listings on the local MLS, a subscription to the local MLS is a practical necessity to meaningfully practice as a real estate agent." *Id.* ¶4 (2-ER-69); *see id.* ¶42 (2-ER-79). In addition, NAR enjoys "overwhelming membership among active agents" in this country. *Id.* ¶15 (2-ER-72); *see id.* ¶48 (2-ER-81).

Some home sellers, the Complaint alleges, prefer to hire brokerage firms or individual real-estate agents to market their homes outside of a NAR-affiliated MLS. For example, "[m]any consumers wish to preserve their privacy and do not want to host viewings or have their property widely available for viewing on a listing website." ¶5 (2-ER-69-70); *see*

3

*id.* ¶¶135-37 (2-ER-108-09).  Other sellers authorize brokers and agents to "engage in limited off-MLS marketing to 'test the waters' to determine the appropriate price for their home listing on the local MLS[.]"  *Id.* ¶5; *see id.* ¶¶64-72 (2-ER-86-89).

Like home sellers, some home buyers may prefer to operate outside of the NAR-affiliated MLS system.  For example, "the typical home sold off-MLS is less 'showroom ready' than homes listed on the MLS."  Such homes "can be attractive to buyers willing to trade condition for price."  Complaint ¶74 (2-ER-89).

According to the Complaint, TAN offers an alternative to the NAR-affiliated MLS system.  TAN provides its members with some services that resemble those provided by an MLS, and some that do not. Like an MLS, TAN "provides the agents in its network with a platform to share market information and data," including information about their listings of "properties the seller has not yet or does not intend to list on an MLS."  Complaint ¶78 (2-ER-90).  But unlike a traditional MLS, TAN offers a "match-making" service for its members that "facilitates one-on-one private conversations between a buyer's agent and seller's agent with symmetrical needs without any marketing of the

4

property." *Id*. ¶79 (2-ER-90). TAN "limit[s] its membership to the top ten percent of agents responsible for most residential real estate transactions by sales volume." *Id*. ¶8 (2-ER-70). But because membership in a local MLS is a practical necessity for any real-estate agent, *see id*. ¶42 (2-ER-79), "[o]ne hundred percent of TAN's members are also members of their local MLS—without exception[.]" *Id*. ¶43 (2-ER-79).

The Complaint focuses on "the market for professional real estate listing services." ¶140 (2-ER-110-11). The participants in this market are not home buyers and sellers. Rather, they are "real estate agents and brokerages on the one side, and centralized listing services on the other." *Id*. Agents and brokerages pay recurring membership fees to listing services for access to a platform allowing them to share and view for-sale property information. *See id*.

TAN and NAR-affiliated MLSs compete in this market. Within this market, along with a few similar services, TAN is one of the only competitive threats to NAR-affiliated MLSs. Otherwise, "there are presently no commercial alternatives to MLSs." Complaint ¶81 (2-ER-91). "Customer-facing websites such as Zillow or Trulia," for instance,

"do not compete with TAN or MLSs, as they are consumers rather than suppliers of property listing services." *Id*. These websites report listings that appear on MLSs but do not independently generate listings.

In late 2019, allegedly fearing competition from TAN and other off-MLS listing networks, NAR promulgated a new mandatory rule for its affiliated MLSs that it called the Clear Cooperation Policy. That rule "requires that any property an agent markets in any way outside of his or her own brokerage off-MLS—either on TAN, similar platforms, or through informal marketing—must be listed on the local MLS within one business day thereafter." Complaint ¶10 (2-ER-71). The Policy exempts "office exclusives"—listings marketed by agents to other agents within the same brokerage firm—from having to be submitted to an MLS. *Id*. ¶12 (2-ER-71).

The alleged purpose and effect of the Policy is to eliminate listing services that compete with the NAR-affiliated MLS system. The Complaint alleges that "NAR officials have discussed openly that the Policy will eliminate TAN specifically as a competitor." ¶11 (2-ER-71). That is because "[i]f anything listed on TAN must almost immediately be listed on the local MLS, consumers cannot use TAN and similar

services for th[e] purpose [of listing off-MLS]." *Id*.; *see id*. ¶99 ("NAR intended for the Policy to coerce agents against using TAN.") (2-ER-97).

The Complaint alleges that, despite the Policy, substantial demand remains for off-MLS listings. ¶117 (2-ER-102-03). "[S]ince May 2020 the share of homes sold without being marketed to the public increased 67%, from 2.4% of homes to 4.0%, with the rate rising every month in 2021." *Id.* The Policy, however, has diverted that demand away from competing listing services like TAN and into "office exclusives." *Id*. ¶¶116-19, 130 (2-ER-102-03, 107). TAN's former listings, in particular, "have not gone to the MLS" but instead have led to "a large increase in the share of 'broker exclusives.'" *Id.* ¶14 (2-ER-72).

For this reason, the Complaint avers, the purpose of the Policy *cannot* be to maximize a property's exposure to potential buyers by forcing listings onto MLSs. If that were the case, NAR would not have adopted the "office exclusives" exception. ¶12 (2-ER-71). "Far from leading to more exposure for home listings, the Policy's 'office exclusive' exception has resulted in significantly *less* exposure." *Id*. ¶14 (2-ER-72) (emphasis in original).

2.  TAN sued NAR and the San Francisco Association of Realtors ("SFAR"). It alleged that the Policy violates, among other laws, Section 1 of the Sherman Act, 15 U.S.C. § 1, as both a per se unlawful "group boycott" against TAN and an unreasonable restraint of competition in the market for professional real estate listing services. The District Court dismissed the Complaint with prejudice, after denying TAN's motions for a temporary restraining order and preliminary injunction. Order, Doc. 92 (1-ER-2-16).

The District Court found that the Complaint "lays out a reasonable argument" that the "overall" effect of NAR's Clear Cooperation Policy "on the market for homes" is anticompetitive. Order 10 (1-ER-11). "The Policy leverages NAR's control of the real estate market to coerce most agents into giving up their off-MLS activities entirely, without regard to the competitive value of those activities." *Id*. The Policy, by forcing consumers who want to market off-MLS "to choose between the MLS and a problematic in-house transaction at a large brokerage, reduces consumer choice and stymies competition among agents for off-MLS sales." *Id*.

But the District Court nevertheless held that TAN failed to allege "antitrust injury," a component of private-plaintiff antitrust standing,

8

because the District Court believed that the Policy, as applied to an "exclusive" network like TAN, has a procompetitive effect. "For homes listed by sellers' agents who are TAN members," the court stated, the Policy forces listings onto MLSs and thus makes "listings available to a much larger audience of agents and their clients." Order 12-13 (1-ER-13-14). The District Court believed that increasing the number of real estate agents who can view a property listing necessarily "increase[s] competition . . . [f]or homes listed" for sale. *Id.* It thus held that "TAN could never allege an antitrust injury from the Policy, because TAN's business model is itself anticompetitive in a way that the Policy would tend to remedy." Order 11 (1-ER-12). When "the plaintiff's desired business model is harmful to competition," the court explained, "injury resulting from the aspect of a competitor's practice that interferes with that business model cannot be antitrust injury." *Id.* at 14 (1-ER-15). Because the District Court reasoned that TAN's harm stemmed from a procompetitive aspect of NAR's policy, it held that TAN did not allege a cognizable antitrust injury.

## SUMMARY OF ARGUMENT

The District Court erred as a matter of law in its antitrust-injury analysis in three fundamental respects.

9

*First*, the District Court focused on the wrong product market. Antitrust law protects competition at all levels of an industry, and the court's analysis should focus on the market where competition allegedly is impaired. TAN alleged a relevant *upstream* market for "professional real estate listing services" in which it competes against NAR-affiliated MLSs to provide listing services to real-estate agents and brokers. Complaint ¶140 (2-ER-110-11). TAN further alleged that the Policy effectively excludes it from that market by depriving it of an essential input: real-estate agents and their listing information.

But the District Court's analysis focused instead on competition in a distinct market: the *downstream* market in which real-estate brokerage services help consumers buy and sell homes. The District Court never analyzed whether TAN's alleged injury flows from the Defendants' anticompetitive acts in the market TAN alleged—namely, the upstream market for listing services provided to agents and brokers. The law requires that analysis.

*Second*, the District Court improperly determined on a motion to dismiss that TAN's business model is inherently anticompetitive. The District Court's analysis appears to rest on the incorrect premise that

10

competition is necessarily enhanced by increasing the visibility of properties to potential buyers. On this view, any practice that adds property listings to MLSs would be procompetitive, while any rival service that is not available to all agents and takes listings away from MLSs would be anticompetitive.

That premise and the District Court's reasoning ignored market realities and the ways in which competition actually can work. Competition can include new rivals taking market share from a dominant provider, replacing the dominant provider altogether with a better product or service, or creating a niche product preferred by some segments of the market. The District Court's reasoning, however, effectively precludes any off-MLS competitor not available to all agents from challenging MLSs in that upstream market—improperly entrenching the dominant market position of the NAR-affiliated MLS system.

*Third*, having deemed TAN's "business model" anticompetitive, the District Court seemed to suggest that TAN's own conduct barred it from challenging NAR's Clear Cooperation Policy as a matter of law. To the contrary, controlling precedent holds that antitrust suits can be

11

brought by parties themselves engaged in anticompetitive conduct, subject to limited exceptions not relevant here. That case law advances the overriding public policies embodied in the antitrust laws.

## ARGUMENT

The "Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958). It "rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress[.]" *Id.* Because it would be "inimical" to these principles to "award damages for losses stemming from continued competition," *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (citation omitted), the Supreme Court has construed Section 4 of the Clayton Act, 15 U.S.C. § 15, to require private plaintiffs to show "antitrust injury" as a necessary component of antitrust standing. *See Associated Gen. Contractors v. California State Council of Carpenters*, 459 U.S. 519, 540 (1983).[2]

---

[2] Another component of antitrust standing asks whether the plaintiff is a "consumer" or "competitor" in the market in which trade was restrained. *Associated Gen. Contractors*, 459 U.S. at 544-45. TAN alleges that it competes in the listing services market where trade was

"Antitrust injury" means injury caused by the defendant's conduct that is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). A private plaintiff therefore must show that "his loss flows from an anticompetitive aspect or effect of the defendant's behavior[.]" *Rebel Oil Co. v. ARCO*, 51 F.3d 1421, 1433 (9th Cir. 1995). Antitrust injury examines whether the plaintiff's injury stems from harm to competition rather than from some other source, such as enhanced competition.

Although the District Court initially stated this general rule of antitrust injury, it ultimately misapplied the rule to the allegations in the Complaint in three fundamental ways.

## A. The District Court's Antitrust-Injury Analysis Erred in Focusing on the Wrong Product Market.

The antitrust laws protect competition in both upstream and downstream product markets. The Sherman Act "does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers." *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948). The "Act is comprehensive in its terms and

---

restrained, which weighs in favor of standing.

coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated." *Id*.

This Court, in *PLS.Com,* recently applied this principle to NAR's Clear Cooperation Policy. In doing so, it recognized that PLS was a competitor in the upstream "real estate network services market," 32 F.4th at 829, and held that PLS was not required to allege harm to home sellers and buyers in the downstream market in order to adequately allege antitrust injury. *Id*. at 832. This Court held that it was sufficient for PLS to allege that brokers and agents, who "are the consumers of PLS' and the MLSs' listing network services," were harmed by the Policy. *Id*. at 833; *see also Thompson v. Metropolitan Multi-List*, *Inc.*, 934 F.2d 1566, 1571 (11th Cir. 1991) (agent-members of realtors' association were the relevant direct "consumers of the multilisting service").

TAN, like PLS, alleged that the relevant product market is "professional real estate listing services," where TAN competes against NAR-affiliated MLSs. Complaint ¶140 (2-ER-110-11); *see id*. ¶¶151, 157, 161 (2-ER-117-20). Brokers and agents use the product they purchase in this upstream market as an "input" to provide a separate

service (brokerage services) in a related but distinct "downstream" market to home sellers and buyers. *See id.* ¶142 (2-ER-111). And in that downstream market, home sellers and buyers—the ultimate end users—are the relevant consumers.

The District Court erred by focusing on the downstream market instead of the upstream listing services market in which TAN alleged anticompetitive harm. The District Court's decision is inconsistent with *PLS.Com* and other longstanding precedent showing that in cases like this, where the plaintiff alleges that it competes in an upstream input market, courts properly analyze competition in that upstream market. *E.g.*, *Mandeville Island Farms*, 334 U.S. at 235 (challenged conduct harmed competition "even though" the "persons specially injured" were "sellers" and not final "customers or consumers"); *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (district court properly focused on whether merger would harm competition in the relevant upstream "input markets for trawl-caught [seafood]," rather than different downstream market where the merging parties had cooperated); *Case-Swayne Co. v. Sunkist Growers, Inc.*, 369 F.2d 449, 457 (9th Cir. 1966) (assessing the impacts on juice manufacturers who

bought juice-grade oranges, not the downstream grocers who bought the juice or the ultimate consumers who drank it), *rev'd on other grounds*, 389 U.S. 384 (1967); *see also Apple, Inc. v. Pepper*, 139 S. Ct. 1514, 1523 (2019) (holding that the "upstream market structure" is not relevant in determining whether a "downstream consumer," who alleged harm in the downstream market, is a direct purchaser able to sue under *Illinois Brick*).

Likewise, in evaluating antitrust injury, courts properly focus on whether the plaintiff's injury flows from anticompetitive conduct in the relevant market identified by the plaintiff, which may be a distinct market upstream of end-user consumers. In cases alleging injury in upstream input markets, the plaintiff is often a competitor. That was the case in *PLS.Com*, where the plaintiff, like TAN, was a new entrant in the upstream listing services market. There, PLS alleged—again, like TAN—that NAR's Clear Cooperation Policy "prevented PLS from gaining a foothold in the [listing services market] and makes it virtually impossible for new competitors to enter, leaving agents with fewer choices, supra-competitive prices, and lower quality products." 32 F.4th

at 840. This Court held that PLS "adequately alleged antitrust injury." *Id*.

Similarly, in *Yellow Page Cost Consultants, Inc. v. GTE Directories Corp.*, 951 F.2d 1158 (9th Cir. 1991), this Court held that a plaintiff could establish antitrust injury in the upstream market in which it competed. There, advertising consultants sued GTE when it barred them from ordering and processing yellow-page advertisements. The consultants competed against GTE—whose salespersons offered similar services—in the upstream "service market of advising advertisers regarding the form, cost, content and location of yellow pages advertisements." *Id*. at 1161-62. This Court held that the harm inflicted by GTE's policy on the consultants in this upstream market constituted antitrust injury; it did not, for instance, also look to the effect in the downstream advertising market. *See id*.; *see also Volvo North America Corp. v. Men's Int'l Professional Tennis Council*, 857 F.2d 55, 68-70 (2d Cir. 1988) (rival organizers of tennis tournaments sufficiently alleged antitrust injury because they were injured in upstream market for tournaments when the defendants' rules reduced

17

the supply of a critical input—tennis players—who could play in the plaintiffs' tournaments).

TAN's alleged injury here is analogous. TAN's business in the upstream market for listing services depends on a critical input: real-estate brokers and agents who are willing to do off-MLS listings. Complaint ¶¶78-80, 143 (2-ER-90, 111-12). Because of NAR-affiliated MLSs' market power over brokers and agents, the Policy allegedly has the practical effect of deterring brokers and agents from listing on alternative services. *See id*. ¶¶11, 98 (Policy eliminates the usefulness of off-MLS services like TAN), 113 (agents "have cited the Policy explicitly in explaining their decision to cancel their [TAN] memberships"), 151-53, 162 (2-ER-71, 96-97, 101, 117-18, 120); *see also* Order 10 (deeming this allegation "reasonable") (1-ER-11); *cf. Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1003 (6th Cir. 1999) (defendant "used its power to effectively discourage experienced real-estate sales agents from working for Re/Max").[3]

---

[3] A plaintiff need allege only that the defendant's policy has the "practical effect," *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 326 (1961), of depriving the plaintiff of critical inputs. It is therefore no answer to say that the Policy does not expressly ban agents from listing on TAN but only requires simultaneous listing on an MLS.

18

The District Court should have evaluated whether the injury to TAN in this market established antitrust injury. On that score, TAN alleged that the Policy's deterrent effect on brokers' and agents' use of off-MLS listing services harms competition in the upstream market for listing services in two ways: (1) by depriving the relevant consumers (brokers and agents) of choice in how to serve their clients because "agents who are not members of a large brokerage will be unable to properly serve customers seeking to market off-MLS," Complaint ¶¶11, 15, 98 (2-ER-71, 72, 96-97), and (2) by impeding or eliminating listing networks that might compete with MLSs, resulting in "a single dominant MLS" in most major markets, *id.* ¶¶39, 81, 162 (2-ER-78, 91, 120). Restraints on consumer choice and exclusion of new market entrants are contrary to fundamental antitrust policy. *See FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459 (1986) ("an agreement limiting consumer choice by impeding the 'ordinary give and take of the marketplace' . . . cannot be sustained under the Rule of Reason") (quoting *Nat'l Soc. of Pro. Eng'rs v. United States*, 435 U.S. 679, 692 (1978)); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 478 (1992) ("market foreclosure" is "facially anticompetitive and exactly

the harm that antitrust laws aim to prevent").

The District Court, however, held that TAN did not suffer antitrust injury because its alleged injury (the loss of its agent members) flows from forcing more listings onto MLSs where listings are "available to a much larger audience of agents and their clients." Order 13 (1-ER-14). This holding is based on an analysis of the wrong market.[4] The competition to which the District Court referred takes place in the downstream market, in which consumers are home buyers and sellers, aided by real-estate brokerage services—not in the upstream market that TAN alleged.

The District Court reiterated this error several times. For instance, it reasoned that "when a seller's agent lists a home on TAN without listing it on the local MLS, competition for that home is decreased" because "[o]nly buyers who have enlisted the services of a TAN member agent are able to view the listing and bid for it." Order 12 (1-ER-13). The "competition" described here is competition among

---

[4] The District Court's holding also improperly disregards TAN's repeated factual allegations, taken as true on a motion to dismiss, that the Policy in fact has *not* forced more listings onto MLSs, but instead has forced off-MLS listings into "office exclusives" at large brokerages. Complaint ¶¶14, 116-19 (2-ER-72, 102-03).

potential buyers, not competition between listing services.  The District Court similarly focused on "facilitating home sales" by allowing "buyers to compare listings and identify potential matches," Order 11 (1-ER-12), asked whether "competition for that home is decreased" by TAN's business, Order 12 (1-ER-13), and described the "market" as the one in which agents "create listings and negotiate sales," Order 13 (1-ER-14); *see also id*. at 2 (1-ER-3) (describing the effect of TAN's business model as having anticompetitive effects "on the real estate market").  In all of these circumstances, the market is centered on the activities of end-user consumers—not on the upstream market.  And, similarly, when assessing TAN's allegations that the Policy limits consumer choice, the District Court wrongly focused on whether the Policy limits choice for end-user consumers, *id*. at 13-14 (1-ER-14-15), not whether the Policy limits choice for the relevant consumers in the listing services market— brokers and agents—as it should have.

Correcting these errors is important because antitrust injury can flow from a reduction of competition in an upstream market regardless of the ultimate effect on competition downstream.  *See Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 324-25

21

(2007) (conduct can harm competition in an input market "[e]ven if output prices remain constant" for end users); *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000) (milk producers sufficiently alleged antitrust injury from collusive price manipulation in upstream market for fluid milk, even though defendants' conduct may have lowered prices for cheese products to downstream consumers); *Sullivan v. NFL*, 34 F.3d 1091, 1101 n.3 (1st Cir. 1994) ("Just because consumers of 'NFL football' are not affected by output controls and price increases does not mean that consumers of a product in the relevant market are not so affected."). The District Court, however, never analyzed this possibility.[5]

To be sure, NAR and SFAR disputed TAN's allegation of the relevant product market in an earlier version of TAN's complaint. But

---

[5] *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024 (9th Cir. 2001), cited at Order 13 (1-ER-14), is inapposite. The plaintiff there alleged that the defendant drove down the price of the product that both parties repackaged and distributed. The plaintiff failed to allege antitrust injury because it never showed that the defendant's pricing was predatory. *See id.* at 1035-36. Here, TAN does not allege that it was injured by Defendants' lower prices; it alleges that Defendants cut off its supply of an essential input. *E.g.*, Complaint ¶¶143, 161 (2-ER-111-12, 120).

market definition is highly factual, so disputes about market definition typically are not resolvable on a motion to dismiss. *See, e.g.*, *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 363 (9th Cir. 1988) ("market definition and market power are essentially questions of fact"); *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1299 (9th Cir. 1982) ("definition of the relevant market is basically a fact question dependent upon the special characteristics of the industry involved"). And here, the District Court never held that the alleged market was legally deficient. Instead, the District Court's analysis simply ignored the relevant product market alleged in the Complaint, which was improper.

### B. The District Court Wrongly Equated More MLS Listings to "Procompetitive" and More Listings Off the Dominant MLS to "Anticompetitive."

The District Court erred in a second fundamental respect— namely by finding, on a motion to dismiss, that NAR's policy was "procompetitive" as applied to TAN because it "keeps listings available to a much larger audience of agents and their clients." Order 13 (1-ER-14). Although the District Court said that it took issue with TAN's "exclusive" membership, *id.*, its reasoning applies to nearly any service

that would challenge a dominant MLS. If a rival wants to create a new type of listing service—even one "open to all licensed agents," Order 11 (1-ER-12)—and take share from the dominant NAR-affiliated MLS, that service will always have less members than the dominant platform when it first launches. Its competitive success, according to the District Court, thus would be "anticompetitive" because it would divert home listings away from a platform with a "much larger audience." Order 13 (1-ER-14). And any service that wants to focus on a different type of home marketing—off-market sales, for example—will by definition expose listed homes to a smaller "audience." *Id.*

By assuming consumers are better off with the current dominant provider—instead of with additional rivalry—the District Court's reasoning disregards basic antitrust principles. As the Supreme Court has made clear, "[t]he Sherman Act reflects a legislative judgment that ultimately competition"—here, between listing services—"will produce not only lower prices, but also better goods and services." *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 695 (1978). For this reason, "[t]he heart of our national economic policy long has been faith in the value of competition." *Id.* (quoting *Standard Oil Co. v. FTC*, 340 U.S.

231, 248 (1951)). The antitrust laws are thus "concerned with the competitive *process,* and their application does not depend in each particular case upon the ultimate demonstrable consumer effect." *Fishman v. Est. of Wirtz*, 807 F.2d 520, 536 (7th Cir. 1986); *accord*, *e.g.*, *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1203 (9th Cir. 2012) ("The relevant injury in [*United States v. Loew's*, 371 U.S. 38 (1962)] was to competition, not to the ultimate consumers"); *Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 486 (1st Cir. 1988) (Breyer, J.) (antitrust law "assesses both harms and benefits in light of the [Sherman] Act's basic objectives, the protection of a competitive process").

   In our free-enterprise system, competition determines which firms in a given market will succeed and which will fail. As this Court has recognized, "fierce, no holds barred competition will drive out the least effective participants in the market, providing the most efficient allocation of productive resources." *United States v. Syufy Enters.*, 903 F.2d 659, 662 (9th Cir. 1990). It can be procompetitive for a new real-estate platform to compete with an MLS for listings, and it is important for the antitrust laws to preserve "the free opportunity [among brokers

and agents] to select among alternative offers." *Pro. Eng'rs*, 435 U.S. at 695. Indeed, antitrust jurisprudence firmly establishes that the role of courts' antitrust analysis is to protect competition, not to pick winners and losers in the marketplace. *See NCAA v. Alston*, 141 S. Ct. 2141, 2163-64 (2021) ("judges make for poor 'central planners' and should never aspire to the role").[6]

The District Court's analysis turns these foundational principles upside down. Among other things, it confuses "procompetitive" with the success of the (typically, NAR-affiliated) MLS system—which will always have the "large[st] audience of agents," Order 13 (1-ER-14)— instead of recognizing the importance of competition between different types of listing services.

Similarly, equating less viewership with an "anticompetitive"

---

[6] To be sure, MLSs often are joint ventures, and some joint ventures can under certain and particular circumstances have procompetitive potential. But that does not mean MLSs are immune from antitrust liability when they adopt anticompetitive policies. It is through competition, not exclusionary conduct, that joint ventures must prove their value. *See, e.g.*, *NCAA*, 141 S. Ct. at 2155-56 (assuming that NCAA is a joint venture, but some of its rules were anticompetitive and properly enjoined); *Realcomp II, Ltd. v. FTC*, 635 F.3d 815 (6th Cir. 2011) (MLS's website policy limiting exposure of discount and non-traditional listings was unreasonable restraint of trade).

character fails to appreciate the different ways that competition can work. Some consumers may want privacy. Not everyone wants to list their home for the entire world to see. A business offering that service is not acting anticompetitively merely because fewer people will be able to see a home. To the contrary, consumers benefit from the various forms of competition that can occur in the upstream market. That competition can take the form of replacing the dominant provider altogether with a better product or service, *see United States v. Microsoft Corp.*, 253 F.3d 34, 49 (D.C. Cir. 2001) ("Competition in . . . industries" where "[o]nce a product or standard achieves wide acceptance, it becomes more or less entrenched" is "'for the field' rather than 'within the field.'") (citation omitted), or creating a niche service tailored to a particular section of the market. It can also involve new rivals taking market share from a dominant provider. In short, new entrants—including those with differentiated business models—must have the opportunity to compete against MLSs at the listing-service level so brokers and agents can choose the service they consider superior, granting options and improved service to consumers in the downstream market. *See PLS.Com*, 32 F.4th at 836 (referencing the

27

harmful impact of the Clear Cooperation Policy on a new entrant's "ability to compete . . . on the merits" against the MLSs "in the market for sellers' listings").

The District Court's analysis leaves no room for this type of competition. And the District Court takes this approach even when the challenged restraint allegedly is used to exclude competition in upstream markets for listing services and thereby entrench MLSs' dominance in those markets. Ultimately, this approach likely would lead to less innovation in listing service features.

To illustrate this basic point, consider *Volvo*, 857 F.2d at 68-70. There, the Second Circuit evaluated rules promulgated by a dominant men's tennis tournament producer, which were challenged by rival tournament producers. In particular, the monopolist defendants used "Commitment Agreements" to restrict the supply of tennis players who could be available for plaintiffs' rival tournaments, which competed with defendants' tournaments. The court held that plaintiffs sufficiently alleged antitrust injury. *See id*. Importantly, the court did not condemn the plaintiffs' business models as "anticompetitive"—although it had a similar opportunity as the District Court in this case—because

the plaintiffs' tournaments might draw players away from the defendants' dominant tournaments, and thereby arguably weaken those tournaments' talent pool, which could have reduced competition at defendants' tournaments. *Cf. Re/Max*, 173 F.3d at 1023 (plaintiff's injury was "of the type sought to be redressed by antitrust law" where the effect of defendant's policy "was to deter [real-estate] agents from defecting to Re/Max, thereby impeding an innovative competitor's access to the market").

The District Court cited no authority for its apparent proposition that adding listings to an open MLS is necessarily procompetitive while converting them to an exclusive service is necessarily anticompetitive. The court cited *Daniel v. American Bd. of Emergency Medicine*, 428 F.3d 408 (2d Cir. 2005), Order 14 (1-ER-15), but that case stands only for the unremarkable proposition (not applicable here) that a plaintiff does not show antitrust injury by alleging that it was deprived of an opportunity to reap supra-competitive prices.[7]

---

[7] *Daniel* is quite different and ultimately distinguishable from this case. There, the Second Circuit understood the plaintiffs' theory of injury as not challenging the restraints that had created a "cartel" of emergency physicians but instead as seeking entry into that cartel so that plaintiffs also could charge supra-competitive prices. *See* 428 F.3d

As applied to TAN, the District Court made a second, related error. The District Court's reasoning rests on its conclusion that one alleged anticompetitive effect of the Policy (limited choice) is outweighed by the unalleged, but supposedly procompetitive, benefit of increasing buyers' access to listings. *See id*. at 13-14 ("the loss of consumers' ability to choose TAN rather than the MLS *pales in comparison to* the procompetitive benefits of open information") (emphasis added).

This sort of balancing is improper in this context. A proper antitrust-injury analysis does not involve weighing different competitive effects against each other. Rather, as explained above, a proper antitrust-injury analysis examines the nexus between the plaintiff's alleged injury and the defendant's anticompetitive conduct in the relevant market. A plaintiff may have antitrust injury even if, at

---

at 439-40. The Second Circuit distinguished *Volvo* as a proper case of antitrust injury in which the plaintiff challenged "an exclusionary scheme that precludes him from entering a market simply because he sues to recover the profits that he otherwise would have earned." *Id*. at 439. TAN seeks to compete against MLSs by challenging an allegedly exclusionary restraint, not to join the NAR-affiliated MLS system.

the later summary judgment or trial stages, the procompetitive benefits of a restraint are determined to outweigh its anticompetitive effects.

Indeed, as this Court repeatedly has recognized, balancing anticompetitive and procompetitive effects in antitrust cases is a *merits issue* that is performed after discovery with the development of a factual record. *See American Ad Mgmt., Inc. v. GTE Corp.,* 92 F.3d 781, 791 (9th Cir. 1996) ("The law clearly envisions that the balancing test is normally reserved for the jury."); *Oltz v. Saint Peter's Community Hospital*, 861 F.2d 1440, 1445 (9th Cir. 1988) ("the fact finder must balance the restraint and any justifications or pro-competitive effects of the restraint"); *see also Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 292 (4th Cir. 2012) (on motion to dismiss "we are not in a position to weigh the alleged anticompetitive risks of the MLS rules against their procompetitive justifications. This rule of reason inquiry is best conducted with the benefit of discovery"); *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 461 (7th Cir. 2020) (error to consider defendant's procompetitive justifications at the pleadings stage). In contrast, antitrust injury is a gatekeeping doctrine that should be straightforward to apply on a motion to dismiss based on the

31

complaint's allegations. *See* 2 P. Areeda & H. Hovenkamp, *Antitrust Law* ¶337d (5th ed. 2021) ("the antitrust injury doctrine depends less on the plaintiff's proof than on the logic of its complaint and its theory of injury").

## C.   A Plaintiff's Own Anticompetitive Conduct Does Not Bar Its Lawsuit Against Another Antitrust Law Violator.

The District Court three times characterized TAN's "business model" as "harmful to competition." Order 14 (1-ER-15); *id*. at 2, 11 (1-ER-3, 12). To the extent that the District Court meant to suggest that TAN lacks antitrust injury because of its own anticompetitive conduct, that reasoning is erroneous.

The Supreme Court made clear long ago that the purposes of the antitrust laws, including promoting competition and deterring anticompetitive behavior, support private lawsuits against antitrust violators regardless of whether the plaintiff also acted anticompetitively. In *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211 (1951), *overruled in irrelevant part, Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984), the Court explained that if plaintiffs were "guilty of infractions of the antitrust laws, they could be held

responsible in appropriate proceedings brought against them by the Government or by injured private persons." *Id*. at 214. But "[t]he alleged illegal conduct of [plaintiff], however, could not legalize the unlawful combination by [defendants] nor immunize them against liability to those they injured." *Id*.; *see also Simpson v. Union Oil Co. of Cal.*, 377 U.S. 13, 24 (1964) (plaintiff suffered "actionable wrong or damage" even though it was party to an unlawful agreement).

That is the case here: if TAN could be said to have violated the antitrust laws (which the District Court did not determine), it could be held responsible in another case. But TAN's supposed anticompetitive conduct does not preclude it from challenging NAR's Policy.

The Supreme Court elaborated on *Kiefer-Stewart* and *Simpson* in *Perma Life Mufflers v. Int'l Parts Corp.*, 392 U.S. 134 (1968), *overruled in irrelevant part, Copperweld, supra*, where the Court generally rejected the doctrine of *in pari delicto*—meaning "in equal fault"—as a defense in antitrust cases. "Both *Simpson* and *Kiefer-Stewart* were premised on a recognition that the purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws." *Id*. at 139. Even if the plaintiff is a wrongdoer, "the law

33

encourages his suit to further the overriding public policy in favor of competition." *Id.*; *see also Fashion Originators' Guild v. FTC*, 312 U.S. 457, 468 (1941) (an antitrust defendant cannot raise as a defense that it engaged in anticompetitive conduct as a response to others' supposedly unethical, immoral, or unlawful conduct).

This Court repeatedly has followed the *Perma Life* principle that "a plaintiff's illegal conduct cannot be raised as a complete bar to his antitrust action." *First Beverages, Inc. v. Royal Crown Cola Co.*, 612 F.2d 1164, 1174 (9th Cir. 1980).[8]  For example, in *Calnetics Corp. v. Volkswagen of America, Inc.*, 532 F.2d 674, 689 (9th Cir. 1976), this Court held that a plaintiff would be "entitled to recover damages actually suffered even though the market position from which Calnetics was displaced had been attained only through illegal conduct." *See also Memorex Corp. v. IBM Corp.*, 555 F.2d 1379, 1381-83 (9th Cir. 1977) (holding that plaintiff's alleged theft of defendant's trade secrets did not

---

[8] This Court has held that a plaintiff can be barred from recovery when an illegal conspiracy "would not have been formed but for the plaintiff's participation," and the jury finds "that the degree of participation of the plaintiff must be equal to that of any defendant[.]" *Javelin Corp. v. Uniroyal, Inc.*, 546 F.2d 276, 279 (9th Cir. 1976).  TAN is not alleged to have participated in the agreement challenged here, however.

"divest [plaintiff] of an antitrust action" because of the "important public policy grounds" enunciated in *Perma Life*).

Defendants in some of these cases pointed to the plaintiff's unlawful conduct to establish an affirmative defense, rather than to argue against the plaintiff's antitrust injury. But the public policies embodied in the antitrust laws are immutable and do not vary with the form of the defendant's argument. *See Memorex*, 555 F.2d at 1382 (although "IBM's defense is different from either 'unclean hands' or *in pari delicto*," the "same considerations which led the Supreme Court to abolish these traditional equitable defenses are present here"). It therefore should make no difference whether the plaintiff's wrongful conduct is characterized as a defense, a lack of antitrust injury, or something else. *See Calnetics*, 532 F.2d at 689 ("Labels . . . are not controlling, and we find no legitimate reason for distinguishing defendants' 'illegal sales' argument from the *in pari delicto* type of defense struck down in *Perma Life*."); *Lamp Liquors, Inc. v. Adolph Coors Co.*, 563 F.2d 425, 431 (10th Cir. 1977) (the "assertion of illegality or *in pari delicto*" is "not properly asserted even under the guise of lack of standing").

35

## CONCLUSION

For the reasons set forth above, this Court should hold that the District Court erred in its antitrust-injury analysis.

March 13, 2023

Respectfully submitted.

/s/ Steven J. Mintz

JONATHAN S. KANTER
*Assistant Attorney General*

DOHA G. MEKKI
*Principal Deputy Assistant
Attorney General*

MAGGIE GOODLANDER
*Deputy Assistant
Attorney General*

DAVID B. LAWRENCE
*Policy Director*

DANIEL E. HAAR
NICKOLAI G. LEVIN
STEVEN J. MINTZ
*Attorneys*

U.S Department of Justice
Antitrust Division
950 Pennsylvania Ave., NW
Washington, DC 20530-0001
Tel. 202-353-0256
Email: Steven.Mintz@usdoj.gov

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS

## 9th Cir. Case Number(s): 21-16494

I am the attorney or self-represented party.

**This brief contains 6,964 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ X ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
[ ] it is a joint brief submitted by separately represented parties;
[ ] a party or parties are filing a single brief in response to multiple briefs; or
[ ] a party or parties are filing a single brief in response to a longer joint brief.
[ ] complies with the length limit designated by court order dated _____.
[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature: s/ Steven J. Mintz**      **Date: March 13, 2023**

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2023, I electronically filed the foregoing Brief for the United States of America as Amicus Curiae Supporting Neither Party with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the CM/ECF System.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>/s/ Steven J. Mintz</u>

*Attorney*